SHELTON JACKSON, ET AL.               CIVIL ACTION NO. 16-0073

VERSUS                                JUDGE S. MAURICE HICKS, JR.

MARK HEBERT, ET AL.                   MAGISTRATE JUDGE WHITEHURST

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by the Defendants, Mark Hebert ("Sheriff Hebert"), former Sheriff of St. Mary Parish, Deputy Dustin Kennedy ("Kennedy"), and Deputy Ryan Russo ("Russo"). See Record Document 23. Plaintiffs, Shelton Jackson ("Jackson") and his wife, Delicia Jackson, oppose the motion. See Record Document 25. For the reasons set forth below, the Defendants' Motion for Summary Judgment is **GRANTED** and all of the Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

## FACTUAL AND PROCEDURAL BACKGROUND

Jackson filed the instant lawsuit pursuant to Title 42, United States Code, Section 1983 and Louisiana state law regarding an incident that occurred on January 15, 2015. Jackson alleges that Defendants violated his constitutional rights under the Fourth Amendment (unreasonable search and seizure), Fifth and Fourteenth Amendments (deprivation of life, liberty or property without due process of law), and the Eighth Amendment (cruel and unusual punishment). See Record Document 1 at ¶ 1. Jackson asserts Section 1983 claims against Kennedy, Russo, and Sheriff Hebert in their individual and official capacities. See Record Document 1 at ¶ 1; Record Document

10.[1]  Jackson also alleges that Kennedy, Russo, and Sheriff Hebert are liable to him under Louisiana law for negligence pursuant to La. Civ. Code art. 2315, and assault and battery.  See Record Document 1 at ¶¶ 20-2; Record Document 10.   Delicia Jackson asserts a claim for damages against Defendants for loss of consortium, mental anguish, and physical illness, including the loss of two pregnancies. See Record Document 1 at ¶ 13; Record Document 10.

Defendants have filed a Rule 56 dispositive motion seeking the dismissal of all claims.  See Record Document 23.   Defendants previously invoked the affirmative defense of qualified immunity. See Record Document 4.  Defendants also contend that Jackson's claims against Sheriff Hebert fail because no constitutional rights were violated, and alternatively, Sheriff Hebert did not implement (or fail to implement) a policy which was the moving force behind the alleged constitutional violations. Defendants seek dismissal of all state law claims as a matter of law.   See Record Document 23-2 at 6.

On January 15, 2015, Jackson was on the job working as a maintenance man for Morgan City, Louisiana, identifying gas lines along the streets. See Record Document 1 at ¶ C; Record Document 25-2 (Jackson Deposition) at 25.  Jackson was wearing a city uniform and was working near a city owned vehicle.  See Record Document 1 at ¶ C. Kennedy was driving an unmarked police vehicle en route to the St. Mary Parish Sheriff's office when he noticed Jackson and believed him to be an individual named

---

[1] Jackson's original complaint names the St. Mary Parish Sheriff's Office as a Defendant.  See Record Document 1 at 1.  Under Louisiana law a parish sheriff's office is not a "person" capable of being sued. See Whittington v. Maxwell, No. 08-1418, 2009 WL 3676990, *3 (W.D. La. Nov. 4, 2009).   Accordingly, to the extent Jackson has asserted a claim against the St. Mary Parish Sheriff's Office it must be **DISMISSED**.

Johnny Francois who was wanted on an outstanding warrant.  See Record Document 23-3 (Kennedy Deposition) at 8-14.[2]  Francois had an active arrest warrant for cultivation of marijuana.  See id. at 9.  Kennedy was not actively in search of Francois on the day this incident occurred.  See id. at 11.  Kennedy was familiar with Francois's appearance because he interviewed him prior to the issuance of the arrest warrant. See id. at 13, 53.  Kennedy believed Jackson to be Francois because of their similar appearance (race, dread locks, and beard) and because Francois previously had a connection with Morgan City, although Kennedy was unaware of Francois's status with city at the time of the incident.  See id. at 13, 48.  Kennedy testified that after he noticed the individual he believed to be Francois he drove around the block and put on his protective vest with the word "Sheriff" displayed on the front and back.  Id. at 14, 34.

Jackson alleges that Kennedy pulled up next to him in his unmarked pickup truck, rolled down his window, and yelled out, "hey, what's your name?" to which Jackson responded, "why, what's wrong?"  Record Document 1 at ¶ C.  Jackson states that the window was rolled down half-way, while Kennedy states the window was rolled down completely.  See Record Document 25-2 at 30; Record Document 23-3 at 34. Jackson testified that when Kennedy pulled up he did not know that he was a sheriff's deputy, and that Kennedy did not announce himself as such. See Record Document 25-2 at 32.  Conversely, Kennedy testified that he pulled up to Jackson he announced himself as "Sheriff's office," explained why he stopped and asked Jackson for his name. Record Document 23-3 at 15.  Because of the angle in which Kennedy's truck was

---

[2] Kennedy could not recall Mr. Francois's name during his deposition, but the audio recording of the incident confirms that Kennedy believed Jackson to be Francois. See Record Document 23-4, Ex. B (Manual attachment of January 15, 2015 audio recording).

parked next to Jackson, Kennedy spoke to Jackson from the driver's side of the car through the passenger window.  See Record Document 25-2 at 31. Kennedy asked Jackson his name, and Jackson responded by asking why he wanted to know his name. See id. at 32.  Kennedy stated, "I am looking for somebody" and described the person as "a black guy with long dreads and a beard."  Id.  Jackson answered by stating "I'm not the guy that you looking for." Id. at 33. Jackson explained that he did not tell Kennedy his name at this point because he didn't know who he was and he could only see Kennedy's face when he was sitting in the truck.  See id.   Kennedy then asked Jackson "How do I know you're not the guy I'm looking for?" Id. at 35.  Jackson replied that he could not be the person because he did nothing wrong, and he does not get into trouble. See Record Document 1 at ¶ C; Record Document 25-2 at 36.  Kennedy responded by saying that he was looking for someone who worked for the city or had worked for the city in the past.  See Record Document 25-2 at 36.  Jackson replied again that he did not have to provide his name.  See Record Document 23-3 at 16; Record Document 23-4.

After Jackson refused to identify himself, Kennedy exited his vehicle. See Record Document 25-2 at 37; Record Document 23-3 at 16.  Kennedy testified that he was only in the truck a few seconds during his conversation with Jackson before he decided to exit his vehicle.  See Record Document 23-3 at 45.  Kennedy also testified that at this point he turned on his audio recording device on. See id. at 16. Jackson testified that when Kennedy exited his vehicle he noticed the "sheriff" logo on Kennedy's vest. Record Document 25-2 at 38.

Jackson testified that Kennedy exited the vehicle and said "so you ain't going to tell me your name, boy?" Id. at 40. Jackson asked – "did you say – boy," to which Jackson claims Kennedy replied, "No, I said Bub." Id. at 40-41. Kennedy testified that he has no recollection of referring to Jackson as "boy." Record Document 23-3 at 38-39. Neither the audio nor the video contains the exchange alleged by Jackson. Kennedy is heard later on the audio recording asking "what's your name 'bub' or 'bud?'" Record Document 23-4.[3] Kennedy then asked Jackson for his name again, but Jackson did not reply and instead turned around to continue his work. See Record Document 25-2 at 41,44. Jackson testified that he knew Kennedy was a law enforcement officer at this point, but did not tell him his name because believed he had done nothing wrong. See id. at 42. Kennedy continued to ask Jackson for his name. See id. at 48.[4] Jackson responded by saying he was not going to provide his name because he had not done anything wrong, and that he doesn't get into trouble. See id. at 48, 60. Jackson suggested that Kennedy call the city or the sheriff to verify that he was not the subject of the warrant. See id. at 48, 60. At this point, Jackson's coworker, Demond Madise, began a video recording the incident on his cell phone. Id. at 24, 26, 61; Record Document 23-5, Ex. C (Manual Attachment of January 15, 2015 video recording).

---

[3] Jackson argues that the term "bub" is racially charged. See Record Document at 25 at 7. The Court was unable to locate a Louisiana or Fifth Circuit case in which the term "bub" was found to be racial in nature.

[4] Jackson testified that his city uniform includes a nametag, but the video evidence demonstrates that he was wearing a jacket at the time of the incident that covered his name. See Record Document 25-2 at 49; Record Document 23-5, Ex. C.

The audio recording of the incident reveals that Kennedy fully informed Jackson at least three times that he was looking for a subject who matched his physical appearance to execute an arrest warrant. See Record Document 23-4, Ex. B. Kennedy also informed Jackson that the person he was looking for worked for the city. See id. Kennedy is heard on the audio requesting Jackson to provide his name numerous times. See id. Jackson refused to comply by responding alternatively with, "it ain't me," "you can't just stop me," "I'm not the suspect," "you're not getting my name," "you've got to stop me for a cause," or "I'm over here working." Id. Kennedy also asked Jackson for his ID. See id. Jackson stated that he did not have an ID with him. See id. Kennedy described Jackson's behavior as confrontational, noting that Jackson talked over him while he was trying to explain what was happening. See Record Document 23-3 at 36, 42. At some point during his conversation with Jackson, Kennedy radioed for backup. See id. at 16-17, 58.

After attempting unsuccessfully to obtain Jackson's name (at least 11 attempts are heard on the audio), Kennedy proceeded to detain Jackson to investigate further. See Record Document 23-3 at 56; Record Document 23-4, Ex. B. Jackson states that Kennedy grabbed his left wrist and attempted to place handcuffs on him. See Record Document 25-2 at 61. Jackson testified that at this point he believed that Kennedy was going to put him in handcuffs and try to hurt or kill him. See id. at 66-67. However, Jackson's subjective feelings are not supported by the video, which shows Kennedy speaking to Jackson in a calm and nonconfrontational manner. See Record Document 23-5, Ex. C. The video demonstrates that while Kennedy was holding Jackson's left wrist, Jackson offered up his wrists to Kennedy and said "put them right here." Id.

When Kennedy attempted to place the handcuffs, Jackson resisted by jerking his arm away from Kennedy and lifting his arms in the air. See id. Jackson then held his arms up in the air, refusing to tell Kennedy his name. See id. Kennedy is heard instructing Jackson to "quit resisting" (at least 7 times), and he also instructed Jackson to "turn around" (at least 25 times), which Jackson refused to do. Id.; Record Document 23-4, Ex. B. Kennedy held Jackson in place until backup arrived, occasionally attempting to move Jackson's left arm behind his back, which Jackson repeatedly resisted. See Record Document 23-5, Ex. C.[5]

Russo, who was working patrol nearby, arrived on the scene. See id.; Record Document 23-3 at 59. With Russo's assistance, Jackson was placed in handcuffs. See id. at 17, 59. According to Jackson, Russo told him to "stop resisting" while putting him in handcuffs to which Jackson replied "I'm not resisting." Record Document 25-2 at 77. Kennedy continued to ask Jackson for identification or his name. See Record Document 23-3 at 17. Jackson continued to reply that he did not have to provide that information. See id. at 17. Jackson then told the officers to "read me my rights," prompting either Kennedy or Russo (it is unclear which from the audio and video) to read Jackson his Miranda rights. Record Document 23-4, Ex. B; Record Document 23-5, Ex. C.

Jackson's supervisor, Kawaika Kai ("Kai"), arrived on the scene around the same time as Russo. See Record Document 25-2 at 71. Kai provided Jackson's identity to Kennedy. See Record Document 23-3 at 18. Kennedy returned to Jackson and asked

---

[5] At this point in the video a woman is heard asking "where's my kid?" Record Document 23-5, Ex. C. She is unrelated to the case and did not speak to either Jackson or Kennedy. See Record Document 25-2 at 68-69.

him if his name was Shelton Jackson, stating he could not let him go unless he confirmed his identity.  See Record Document 25-2 at 74-75.  The audio demonstrates that Kennedy stated "if that's your name I'm taking those off."  Record Document 23-4, Ex. B.  Jackson replied, "Yes, that's my name."  Record Document 25-2 at 75. Once Jackson's identity was established, Kennedy released him from the handcuffs. See id.; Record Document 23-3 at 18.  Kennedy apologized to Jackson for the inconvenience, shook his hand, and then Kennedy and Russo left the scene.  See Record Document 25-2 at 79-81.

Jackson testified that Russo "roughed up" his left arm, and was "pushing" his shoulder up. Id. at 76. Jackson also testified that Kennedy was twisting his wrists. See id.  After Jackson was released, he went to a local urgent care center.  See id. at 84-85.  He told the doctor that he had pain in his left arm and his head hurt.  See id.  Jackson stated that his head hurt from Russo grabbing his hair.  See id. at 84. The video indicates that Russo grabbed the back of Jackson's head while trying to cuff him, although it is not clear from the video whether he grabbed Jackson's hat or hair.  See Record Document 23-5, Ex. C.  Urgent care released Jackson with a return to work date of January 19th with light duties until January 26th.  See Record Document 25-2 at 85-88.  Jackson sought additional treatment from an orthopedist on March 12, 2015, who suggested that he visit a chiropractor for his pain.  See id. at 90.  Jackson did see a chiropractor, but testified that the chiropractor's adjustment caused the pain on the left side of his body to increase such that he now feels pain in his left ribcage area.  See id. at 107.

At the time of Jackson's deposition he had not returned to work because he claims his left arm is still injured and his shoulder hurts from tendonitis. See id. at 106-107, 109. Jackson also claims to have daily headaches and insomnia. See id. at 107-108. He stated that he cannot sleep at night because of the pain and stress from the incident because he felt like the deputies were trying to kill him and that police are still "coming after him." Id. at 111. Jackson also claims that he has nightmares, night sweats, and talks in his sleep because of the incident. See id. at 115. He also testified that he is now afraid to leave his house. See id. at 116.

## LAW AND ANALYSIS

### I. Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See id. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). A nonmovant cannot meet the burden of proving that

a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. <u>See</u> <u>Boudreaux v. Swift Transp. Co.</u>, 402 F.3d 536, 540 (5th Cir. 2005).

In reviewing a motion for summary judgment, the court is to view "the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party." <u>Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc.</u>, 292 F.3d 471, 478 (5th Cir. 2002); <u>see</u> <u>also</u> <u>Harris v. Serpas</u>, 745 F.3d 767, 771 (5th Cir. 2014). However, when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should "review [ ] the facts in the light depicted by the videotape." <u>Scott v. Harris</u>, 550 U.S. 372, 381, 127 S.Ct. 1769, 1776 (2007); <u>see</u> <u>also</u> <u>Carnaby v. City of Houston</u>, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene."). Further, the court should not, in the absence of any proof, presume that the nonmoving party could or would prove the necessary facts. <u>See</u> <u>Little</u>, 37 F.3d at 1075.

## II. Official Capacity Claims

Jackson has asserted Section 1983 claims against Kennedy and Russo in both their official and individual capacities. <u>See</u> Record Document 1 at ¶ 1. Defendants

argue that the official capacity claims against Kennedy and Russo are redundant, and should be dismissed.  <u>See</u> Record Document 23-2 at 4.

A suit brought against a defendant in his official capacity is, effectively, a suit against the governmental unit that employs the defendant. <u>Monell v. Dept. of Soc. Serv.</u>, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035 n. 55 (1978); <u>Brooks v. George County, Miss.</u>, 84 F.3d 157, 165 (5th Cir. 1996).  Therefore, an official capacity suit against a municipal official "generally represents only another way of pleading an action against an entity of which an officer is an agent." <u>Monell</u>, 436 U.S. at 690 n.55.  It is firmly established that a municipality cannot be held liable for the unconstitutional acts of its non-policy making employees under the theory of respondeat superior.  <u>Id.</u> at 691.  Therefore, it is appropriate to dismiss allegations against officers in their official capacities where those allegations duplicate claims against the respective governmental entity. <u>Castro Romero v. Becken</u>, 256 F.3d 349, 355 (5th Cir. 2001).

Jackson's official capacity claims against Kennedy and Russo are functionally equivalent to his claims against Sheriff Hebert in his official capacity, and are therefore redundant.  Accordingly, Plaintiffs' claims against Kennedy and Russo in their official capacities are **DISMISSED**.

**III.    Section 1983 Claims Against Deputies Kennedy and Russo**

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from liability if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). "Qualified immunity protects officers from suit unless their conduct violates

a clearly established constitutional right." <u>Mace v. City of Palestine</u>, 333 F.3d 621, 623 (5th Cir. 2003). Once the defendant raises the qualified immunity defense, "the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." <u>Brumfield v. Hollins</u>, 551 F.3d 322, 326 (5th Cir. 2008). Claims that law enforcement officers made an unlawful detention or arrest are analyzed under the Fourth Amendment. <u>See</u> <u>Brown v. Texas</u>, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640 (1979). Claims that law enforcement officers used excessive force are also analyzed under the Fourth Amendment. <u>See</u> <u>Mace</u>, 333 F.3d at 624 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989)). [6]

The court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. <u>See</u> <u>Freeman v. Gore</u>, 483 F.3d 404, 410 (5th Cir. 2007). First, the court must determine whether the defendant violated the plaintiff's constitutional rights. <u>See</u> <u>id.</u> Second, the court must decide "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." <u>Id.</u> at 410-411. Even on

---

[6] Jackson also claims that his Fifth, Fourteenth, and Eighth Amendment rights were violated. <u>See</u> Record Document 1 at ¶ 1. The Fifth and Fourteenth Amendments only begin to protect an individual after an arrest, and after the individual is released from the arresting officer's custody and placed into detention awaiting trial. <u>See</u> <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441, 452 (5th Cir. 1998). The Supreme Court has held that claims involving law enforcement's use of excessive force in the course of an arrest, investigatory stop, or any other "seizure" of a free citizen are to be analyzed under the Fourth Amendment's "objective reasonableness" standard rather than the Fourteenth Amendment's substantive due process standard. <u>Graham</u>, 490 U.S. at 395. As such, Jackson's claims under the Fifth and Fourteenth Amendment are **DISMISSED**. Jackson's claim under the Eight Amendment must also be **DISMISSED**. A claim for excessive force under the Eighth Amendment is only applicable to force taken against a convicted prisoner. <u>See</u> <u>Ingraham v. Wright</u>, 430 U.S. 651, 667-68, 97 S.Ct. 1401, 1410 (1977).

summary judgment, courts cannot ignore that qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

### A. Unlawful Detention or Arrest

The Supreme Court has consistently recognized that police officers are allowed to ask a person for identification without implicating the Fourth Amendment. See Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185, 124 S.Ct. 2451, 2458 (2004) (citing INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762 (1984) ("[I]nterrogation relating to one's identity or request for identification by police does not, by itself, constitute a Fourth Amendment seizure."). As set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), a law enforcement officer who has a reasonable suspicion that an individual may be involved in criminal activity may briefly stop that individual and take steps to investigate further. See Hiibel, 542 U.S. at 185 (citing Delgado, 466 U.S. at 216). A stop for further investigation is considered a seizure, and must be limited in time to remain constitutionally sound. See Hiibel, 542 U.S. at 185 (citing U.S. v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568 (1985). Additionally, the officer's actions in stopping the individual "must be justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." Id. (quoting Sharpe, 470 U.S. at 682).

As part of a Terry stop, police officers are within their right to demand identification as a routine matter. See Hiibel, 542 U.S. at 186. "The ability to briefly stop a suspect, ask questions, or check identification in the absence of probable cause

promotes the strong government interest in solving crimes and bringing offenders to justice." Id. (quoting U.S. v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 680 (1985)). Numerous states, including Louisiana, have "stop and identify" statutes that require an individual to provide identification if a police officer has made a lawful Terry stop. See Hiibel, 542 U.S. at 183 (citing La. Code Crim. Proc. art. 215.1(A)). Louisiana's "stop and identify" statue states:

> A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and explanation of his actions.

La. Code of Crim. Proc. art. 215(A). "Inherent in the officer's right to stop a suspect and demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify the information given or to obtain information independently of his cooperation." State v. Fauria, 393 So.2d 688, 690 (La. 1981) (citing White v. Morris, 345 So.2d 461 (La. 1977). Law enforcement may demand identification as part of a lawful Terry stop, but they may not arrest a suspect for failing to identify himself *if the request for identification is not reasonably related to the circumstances justifying the stop*. See Johnson v. Thibodaux City, 887 F.3d 726, 733 (5th Cir. 2018) (emphasis added); Hiibel 542 U.S. at 188-89.

In Louisiana, if a law enforcement officer is conducting a lawful Terry stop and has requested identification from a suspect which is reasonably related to the purpose of the stop, the suspect's refusal to provide the officer with his proper name is an arrestable offense pursuant to La. R.S. 14:108, which provides in pertinent part:

> A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure

of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, or seizing property, or serving process is acting in his official capacity.

B. (1) The phrase 'obstruction of' as used herein, shall, in addition to its common meaning, signification, and connotation mean the following:

* * *

(c) Refusal by the arrested or detained party to give his name and make his name known to the arresting or detaining officer or providing false information regarding the identity of such party to the officer.

State v. Harveston, 2010-1402 (La. App. 4 Cir. 5/11/11), 71 So.3d 954, 958 (quoting La. R.S. 14:108).[7]  Pursuant to La. Code Crim. Proc. art. 213, an officer may, without a warrant, arrest a person who has committed an offense in his presence if the totality of the known circumstances indicates that it is "reasonably probable" that a crime has been committed.  Harveston, 71 So.3d at 958 (citing State v. Simms, 571 So.2d 145, 149 (La. 1990)).

The evidence in the record demonstrates that Kennedy performed a lawful Terry stop regarding the execution of an outstanding arrest warrant.[8]  Jackson was stopped

---

[7] Jackson argues that White v. Morris, 345 So.2d 461 (La. 1977) provides that an officer cannot arrest a suspect for failing to provide identification in accordance with Article 215.1.  See Record Document 25 at 11-12.  However, the court in White found that the request for identification was not reasonably related to the purpose of the stop.  This Court also notes that White analyzes a previous version of La. R.S. 14:108, which by its terms was only applicable to an "arrested party."  See 345 So.2d at 465.  The statute was amended in 2006, and now applies equally to detained parties.  See La. R.S. 14:108(B)(1)(c).

[8] Jackson also argues that the stop was improper because Kennedy allegedly failed to follow proper procedure while executing an arrest warrant.  See Record Doc. 25 at 9 (citing La. Crim. Pro. art. 217).  Article 217 states: "[a] peace officer, *when making an arrest* by virtue of a warrant, shall inform the person to be arrested of his authority and of the fact that a warrant has been issued for his arrest [. . .]." (emphasis added).  Officer Kennedy was not executing a warrant when he encountered Jackson,

and briefly questioned because Kennedy reasonably believed him to be Mr. Francois, who had an outstanding arrest warrant for a drug charge.  <u>See</u> Record Document 23-3 at 8-14.   Kennedy testified that he stopped his vehicle to investigate whether Jackson was Francois based on his personal knowledge of Francois's appearance (race, dread locks, facial beard) and Francois's prior history with Morgan City.  <u>See id.</u> at 13, 47-48.  Under the circumstances, Kennedy's actions were reasonable and well within the permissive scope of an investigatory <u>Terry</u> stop to gather additional information to execute an outstanding arrest warrant.

The audio visual evidence also clearly demonstrates that Kennedy, wearing a vest with the word "SHERIFF" printed in large bright yellow letters across the front and back, informed Jackson that he needed to know his identity because he believed him to be an individual wanted on an arrest warrant based on his physical characteristics and his connection to Morgan City.   Record Document 23-4; Record Document 23-5.  Jackson also testified that he was aware that Kennedy was an officer. <u>See</u> Record Document 25-2 at 42.  Despite Jackson's belief to the contrary, once Kennedy properly identified himself as a law enforcement officer and stated that he needed Jackson's identity to determine if he was the subject of an outstanding arrest warrant, Jackson was required to provide his identity, not merely assert that he was not the person named on the warrant.  <u>See</u> La. R.S. 14:108(c); <u>compare</u> <u>Brown v. Lynch</u>, 524 F. App'x 69, 78 (5th Cir. 2013) (arrest under La. R.S. 14:108 not warranted where upon request the suspect provided identification, submitted to a frisk, and answered officers' questions).

___

but was instead conducting a valid investigatory <u>Terry</u> stop to determine if Jackson was the subject of the warrant.  Article 217 is inapplicable to this case.

Jackson argues that Kennedy could have taken other steps to determine whether he had the correct person rather than insist that he provide his identity.  See Record Document 25 at 10.  Kennedy testified that it did not occur to him to do this at the time of the incident.  See Record Document 23-3 at 43.  In hindsight, Kennedy could have called the Morgan City water department and ascertained whether Mr. Francois was currently working for them at the location of the incident.  However, officers are not expected to work with the benefit of hindsight.  The question is whether the officer acted reasonably in light of clearly established law and the information he possessed at the time. Given Kennedy's right to conduct a brief investigatory Terry stop to determine whether Jackson was the individual named in the arrest warrant, his actions were reasonable.

The video evidence demonstrates that Jackson was briefly handcuffed and read his Miranda rights.  See Record Document 23-4; Record Document 23-5.   However, an official arrest was not completed and Jackson was released as soon as his identify was established.   See Record Document 23-4; Record Document 23-3 at 18; Record Document 25-2 at 75.   Handcuffing a suspect does increase the intrusiveness of a Terry stop, and may escalate an investigatory stop into an arrest requiring probable cause.  See Brown, 524 F. App'x. at 75-76.   However, even if Jackson were arrested, Kennedy had probable cause to arrest Jackson pursuant to La. Rev. Stat. 14:108(B)(1)(c) due to Jackson's repeated failure to comply with Kennedy's request for identification.

The Court finds that the summary judgment evidence does not support a finding that Kennedy or Russo violated Jackson's Fourth Amendment right to be free from an

unlawful detention or false arrest. Accordingly, Kennedy and Russo are entitled to qualified immunity as to this claim, and Jackson's claims against them are **DISMISSED**.

### B.    Excessive Force

Jackson also alleges that Kennedy and Russo exercised excessive force when placing him in handcuffs. See Record Document 1 at ¶ 16. A plaintiff's claim for excessive force is analyzed under the Fourth Amendment. See Graham, 490 U.S. at 395. The Fifth Circuit applies a three-part test, requiring a plaintiff to show that he suffered "(1) an injury that (2) resulted directly and only from use of a force that was excessive to the need and that (3) the force was objectively unreasonable." Goodson v. City of Corpus Christi, 202 F.3d 730, 740 (5th Cir. 2000). Determining whether the amount of force used was reasonable requires a balancing of the nature of the intrusion on the individual's Fourth Amendment interest against the government's countervailing interests. See Graham, 490 U.S. at 396 (quotation omitted). "This is a fact-specific inquiry to be made from the perspective of an objectively reasonable officer at the scene, rather than in hindsight." Davila v. United States, 713 F.3d 248, 259 (5th Cir. 2013) (citing Graham, 490 U.S. at 396).

Law enforcement officers are allowed to use some degree of physical coercion or threat thereof when making an arrest or an investigatory stop. See Graham, 490 U.S. at 396 (citing Terry, 392 U.S. at 22-27 (1968)). "Officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." Davila, 713 F.3d at 260 (quoting Hensley, 469 U.S. at 235). Reasonableness is determined by considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Bush v. Strain, 513 F.3d 492, 501 (5th Cir. 2008) (quoting Graham, 490 U.S. at 396). An officers' underlying intent or motivation are irrelevant in determining whether his actions were "objectively reasonable." Graham, 490 U.S. at 396. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. (citing Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723 (1978)).

Jackson alleges that he suffered an injury to his left shoulder that continues to cause him pain. See Record Document 25-2 at 76, 106-109. Jackson also alleges that he has suffered psychological injuries which cause physical symptoms including insomnia, nightmares, and night sweats. See id. at 115. The Court notes that Jackson did not supply evidence of his alleged injuries, such as a doctor's report, in connection with his claim. However, even if the Court assumes that Jackson was injured, the video and audio evidence in the record do not support a finding that the amount of force used by Kennedy or Russo was excessive or objectively unreasonable.

Jackson actively resisted Kennedy's attempts to place him in handcuffs by repeatedly pulling his left arm close to his chest to prevent Kennedy from moving his arm behind his back. See Record Document 23-5. When Russo arrived he assisted Kennedy in turning Jackson such the he was facing the hood of Kennedy's truck. See id. In doing so, Russo placed his hand on the back of Jackson's head, grabbing Jackson's hat and possibly his hair while turning Jackson towards the vehicle. See id. Jackson is heard on the video saying "you're pushing me up," apparently to Russo, in

reference to his left shoulder.  Id.; Record Document 25-2 at 76.  The video shows Russo and Kennedy placing Jackson's hands behind his back in a manner typical of an arrest, holding him in place until the handcuffs were secured.  See Record Document 23-5.  Given Jackson's repeated attempts to prevent Kennedy from placing him in handcuffs and Kennedy's belief that Jackson was possibly an individual named in an arrest warrant, the use of minimal force by Russo and Kennedy to hold Jackson in place while securing him in handcuffs was reasonable under the circumstances of this case.

Jackson has failed to establish that either Kennedy or Russo violated his constitutional rights or acted unreasonably.  As such, Jackson's claims against Kennedy and Russo for excessive force in violation of the Fourth Amendment must also be **DISMISSED**.

## IV.    Section 1983 Claims Against Sheriff Hebert in his Individual Capacity

Jackson alleges that Sheriff Hebert, as supervisor and decision-maker for the St. Mary Parish Sheriff's Office, deprived him of his civil rights in violation of 42 U.S.C. § 1983.  See Record Doc. 1 at ¶ 7.  Jackson claims that Sheriff Hebert failed to properly train, supervise, equip and control his employees, and failed to remove unqualified officers from the police force.  See id. at ¶ 10.  Jackson alleges that Sheriff Hebert failed to supervise his employees or "take reasonable steps to ensure that the public would not be harassed, injured, harmed, or subjected to violations of their civil rights by officers of the St. Mary Parish Sheriff's Department."  Id. Jackson also alleges that Sheriff Hebert failed to train his deputies regarding proper searches and seizures.  See id.  Sheriff Hebert has asserted the defense of qualified immunity.  See Record Document 4.

Supervisory officials, such as Sheriff Hebert, may not be held individually liable under Section 1983 for the actions of subordinates on theories of vicarious liability or respondeat superior. See Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). Rather, a plaintiff must show that the conduct of the supervisor denied him of his constitutional rights. Id. In cases where "a plaintiff alleges a failure to train or supervise, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Id. (quoting Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998). Deliberate indifference is a stringent standard, requiring a showing higher than negligence or even gross negligence. Id. The official must be aware of facts sufficient to infer that a substantial risk of serious harm exists, and he must be aware of the risk. Id. To establish deliberate indifference, a plaintiff usually must demonstrate a pattern of violations such that the inadequacy of the training or supervision is obvious and likely to result in a constitutional violation. Id.

Jackson's claims against Sheriff Hebert fail for two reasons. First, because this Court has found that Jackson's constitutional rights were not violated, there is no underlying constitutional violation to which Sheriff Hebert's alleged failure to supervise or train may be causally linked. See Kennedy v. City of Shreveport, No. 07-1049, 2008 WL 2437043, at *6 (W.D. La. June 13, 2008); Whitley v. Hanna, 726 F.3d 631, 648 (5th Cir. 2013); Billizone v. Jefferson Parish Corr. Center., No. 14-1263, 2014 WL 7139636, at *5 (E.D. La. Dec. 15, 2014). Second, even if there were a constitutional violation, Jackson has failed to establish that Sheriff Hebert acted with deliberate indifference. As

to Jackson's claims regarding failure to supervise, there is no evidence in the record to suggest that Hebert had knowledge of a substantial risk of harm to citizens by Kennedy and Russo. The record is void of any other incident sufficient to demonstrate a pattern of similar incidents causing harm, which would provide Sheriff Hebert with the knowledge of a substantial risk. Estate of Davis, 406 F.3d at 383. As such, Jackson's claim against Sheriff Hebert for failure to supervise must be **DISMISSED**.

Similarly, a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference with regard to a claim for failure to train. See Brown v. Callahan, 623 F.3d 249, 255 (5th Cir. 2010). "[W]ithout notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Porter v. Epps, 659 F.3d 440, 447 (5th Cir. 2011) (quoting Connick v. Thompson, 563 U.S. 51, 62, 131 S.Ct. 1350, 1360 (2011)). Jackson has offered no evidence of a pattern of similar violations. Instead, Jackson argues that Kennedy testified that his supervisor assured him that he had adhered to the Sheriff's office policy during his encounter with Jackson, which Jackson contends is sufficient to establish a lack of training regarding how to lawfully execute an arrest warrant. See Record Document 25 at 12; Record Document 23-3 at 47. The Court notes that Kennedy testified that it was Sennet Wiggins who discussed the matter with him, not Sheriff Hebert. See Record Document 23-3 at 47. Regardless, there is insufficient evidence to support a finding of deliberate indifference by Sheriff Hebert because this court has found that it is not unconstitutional for an officer to perform a brief Terry stop

to investigate an outstanding arrest warrant and ask an individual for identification in the course thereof. Jackson's claims for failure to train must be **DISMISSED**.

Jackson also alleges that Sheriff Hebert selected, retained, and assigned employees with propensities for excessive force, violence, negligence, and other misconduct. See Record Document 1 at ¶ 10. Supervisors, acting in their supervisory role, "can only be held liable under section 1983 in their individual capacities for their participation in the deprivation of a constitutional right if there is a causal connection between the supervisor's wrongful conduct and the constitutional violation." Young v. Akal, 985 F.Supp.2d 785, 800 (W.D. La. 2013) (citing Lozano v. Smith, 718 F.2d 756, 768 (5th Cir. 1983). Jackson has put forth no evidence to support such a claim, much less a causal connection. There is no evidence in the record of any other incidents involving Kennedy or Russo that would support a finding that Sheriff Hebert knowingly and with deliberate indifference hired, retained, or assigned an employee with a propensity for excessive force, violence, negligence, or other misconduct. As such, Jackson's claim against Sheriff Hebert in his individual capacity must be **DISMISSED**.

## V.    Section 1983 claims against Sheriff Hebert in his Official Capacity

Jackson also asserts a section 1983 claim against Sheriff Hebert in his official capacity based on his alleged promulgation of unconstitutional practices, policies, customs, and usages within the St. Mary Parish Sheriff's Office. See Record Document 1 at ¶¶ 10-11. Jackson alleges that Sheriff Hebert maintained, enforced, tolerated, permitted, or acquiesced in the application of the following policies, customs, or usages causing a violation of his constitutional rights: (1) subjecting people to unreasonable use of seizure and force; (2) selecting, retaining, and assigning employees with

demonstrable propensities for excessive force, violence, negligence, and other misconduct; (3) failing to adequately discipline officers involved in misconduct; (4) condoning and encouraging officers to believe that they may violate the rights of minorities with impunity without adverse effects on their employment; (5) failing to train, supervise, equip and control employees to ensure unqualified officers are not on the force; (6) failing to take reasonable steps to make sure the public is not subjected to violations of their civil rights by its officers; (7) failure to train regarding search and seizure; (8) failure to train regarding the criteria to detain a member of the public, including minorities. See Record Doc. 1 at ¶ 10.

Claims against the Sheriff Hebert in his official capacity are treated as claims against the municipality he represents. See Ballard v. Gautreaux, 675 F.3d 454, 462 (5th Cir. 2012). Liability of a municipality under Section 1983 requires a plaintiff to prove three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom. See Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) (citing Monell, 436 U.S. at 694). The three elements "are necessary to distinguish individual violations perpetrated by local government employees from those than can be fairly identified as actions of the government itself." Piotrowski, 237 F.3d at 578. "[I]solated unconstitutional actions by municipal employees will almost never trigger liability". Id. (citing Bennett v. City of Slidell, 728 F.2d 762, 768 n.3 (5th Cir. 1984), cert denied, 472 U.S. 1016, 105 S.Ct. 3476 (1985)).

An "official policy" can be evidenced through "duly promulgated policy statements, ordinances or regulations," or by a custom that is such a persistent and

widespread practice that, although not officially promulgated, it fairly represents a municipal policy. <u>Webster v. City of Houston</u>, 735 F.2d 838, 841 (5th Cir. 1984); <u>see also</u> <u>Zarnow v. City of Wichita Falls, Tex.</u>, 614 F.3d 161, 168–69 (5th Cir.2010). To establish the "moving force" requirement, a plaintiff must show that the municipality's policy or custom that caused the alleged harm was either unconstitutional or "promulgated with deliberate indifference." <u>Piotrowski</u>, 237 F.3d at 578. Where a policy is facially constitutional, a plaintiff must demonstrate that the policy was promulgated with deliberate indifference that a known or obvious unconstitutional consequence would result. <u>See id.</u> at 579.

Jackson's allegations regarding Sheriff Hebert's failure to supervise and failure to train are insufficient to survive summary judgment for the reasons previously discussed herein. Likewise, the Court has held that Jackson's allegations regarding the selection, retention, and assignment of employees with a propensity for excessive force or violence to be insufficient as well. Plaintiff's remaining allegations regarding policies or customs instituted by Sheriff Hebert are threadbare and conclusory. Jackson has presented the Court with no evidence of any official promulgated policies, nor has he shown an unofficial custom that is so widespread that it represents a policy. Although Jackson alleges a policy of subjecting people to unreasonable use or seizure and force, he has offered no further evidence than his own experience during a valid <u>Terry</u> stop. As for the alleged failure by Sheriff Hebert to properly discipline officers involved in misconduct, Jackson has only provided the Court with evidence that Kennedy was not disciplined after the incident involved in this case. <u>See</u> Record Document 23-3 at 59-60. This single example is insufficient to establish an unofficial policy or custom.

Jackson asserts a serious conclusory allegation, without any evidence in support thereof, that Sheriff Hebert condones and encourages officers to violate the rights of minorities with impunity. Likewise, Jackson asserts that Sheriff Hebert failed to take steps to make sure the his officers do not violate the public's civil rights. Conclusory allegations are simply insufficient to establish a unconstitutional policy or custom.

Moreover, Jackson's official capacity claims against Sheriff Hebert also fail because this Court has held that Kennedy and Russo did not violate Jackson's clearly established constitutional rights. See <u>Kennedy</u>, 2008 WL 2437043, at *5. Thus, there is an absence of an underlying constitutional violation, which is a necessary element to establish municipal liability. Accordingly, Jackson's claims against Sheriff Hebert in his official capacity must be **DISMISSED**.

**VI.    State Law Claims**

Jackson also asserted state law claims of negligence and assault and battery arising out of the same allegations discussed above. It is well settled that Louisiana employs the same standards in analyzing claims of unlawful detention and excessive force as federal law, namely, whether the officer's actions were "reasonable" under the circumstances. See <u>Reneau of City of New Orleans</u>, No. 03-1410, 2004 WL 1497711, *4 (E.D. La. July 2, 2004) (citing <u>Kyle v. City of New Orleans</u>, 353 So.2d 969, 973 (La. 1977); <u>Mathieu v. Imperial Toy Corp.</u>, 94-0952 (La. 11/30/1994), 646 So.2d 318, 323. Because Jackson has not presented evidence to controvert that the deputies' actions were reasonable under the circumstances, his state law claims must be **DISMISSED**.

Jackson also asserted a claim against Sheriff Hebert for negligent hiring, supervision, and retention based on the alleged actions of Kennedy and Russo. See

Record Document 1 at ¶¶ 30-34. Because the Court has determined that Jackson's constitutional rights were not violated by Kennedy and Russo, Jackson's claim against Sheriff Hebert for his alleged hiring, supervision, and retention of Kennedy and Russo are unsupported and must also be **DISMISSED**.

## VII. Delicia Jackson's Claims

Delicia Jackson alleges that she has suffered damages as a result of the incident between her husband and the Defendants, including loss of consortium, mental anguish, physical illness, and two miscarriages. Record Document 1 at ¶ 6. Under Louisiana law a claim of loss of consortium is derived from a tortfeasor's liability to the injured spouse. Ferrell v. Fireman's Fund Ins. Co., 96-3028 (La. 7/1/97), 696 So.2d 569, 576. Because this Court has held that Defendants are entitled to qualified immunity and are not liable to Jackson, Delicia Jackson's loss of consortium claim must be **DISMISSED**. See also Zuyus v. Hilton Riverside, 439 F.Supp.2d 631, 638-39 (E.D. La. 2006) (loss of consortium unavailable in conjunction with spouse's federal civil rights claim).

Delicia Jackson's claim for damages based on her mental anguish, physical illness, and lost pregnancies also fail as a matter of law. Recovery of damages for mental anguish caused by injury to another requires that the plaintiff: (1) view the event causing injury to the victim or arrive on the scene soon after; (2) the direct victim suffered a harm that can reasonably be expected to cause plaintiff serious mental anguish; (3) the emotional distress sustained is serious and reasonably foreseeable; and; (4) plaintiff and direct victim have a familial relationship. Castille v. Louisiana Medical Mut. Ins. Co., 2014-519 (La. App. 3 Cir. 11/5/14), 150 So.3d 614 (citing Lejeune

v. Rayne Branch Hosp., 556 So.2d 559 (La. 1990).  There is no evidence to indicate that Delicia Jackson was present during the incident, nor that she arrived soon afterwards.  Moreover, because this Court has found that her husband's constitutional rights were not violated any harm caused to Delicia Jackson was not reasonably foreseeable to the Defendants.  Accordingly, this claim for damages must also be **DISMISSED**.

## CONCLUSION

The Motion for Summary Judgment filed by the Defendants (Record Document 23) is hereby **GRANTED**.  Kennedy, Russo, and Sheriff Hebert are entitled to qualified immunity as to Jackson's section 1983 claims against them in their individual capacities.  Jackson's section 1983 claims against Sheriff Hebert in his official capacity also fail because there is no underlying constitutional violation nor evidence of unconstitutional policies or customs.  Jackson's state law claims fail as a matter of law.  Delicia Jackson's claim for damages also fails as a matter of law.  Accordingly, all claims are hereby **DISMISSED WITH PREJUDICE**.

A Judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 13th day of July, 2018.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT